# EXHIBIT F

74 Baylor L. Rev. 783

**Baylor Law Review**
Fall, 2022

Note and Comment

Matthew Vitale [a1]

Copyright © 2022 by Baylor Law Review; Matthew Vitale

## *783 UNSTOPPABLE FORCE MEETS (PREVIOUSLY) IMMOVABLE OBJECT: THE CONFLICT BETWEEN FEDERAL CIRCUIT MANDAMUS AND TRIAL-COURT DEFERENCE IN PATENT LITIGATION

**INTRODUCTION**

A plaintiff's choice of forum is frequently a weighty one. In patent cases, one venue reigns supreme: the Western District of Texas, where more patent cases are filed than anywhere else in the country. [1] Plaintiffs consistently file in that district because Judge Alan Albright, Magistrate Judge Derek Gilliland, and their clerks are knowledgeable about patent issues, the docket moves quickly, and the juries are perceived to be friendly. But the Western District is not only known for hearing more patent cases than its counterparts around the country. Judge Albright also bears the dubious distinction of being the primary target of the Federal Circuit's ire for frequently refusing to transfer his patent cases.

As with any other civil case, a patent-infringement plaintiff's choice of forum is subject to the defendant's motion to transfer the case to another proper forum. [2] Upon a motion to transfer in the Fifth Circuit, the district court engages in a fact-intensive balancing act between several private- and public-interest factors, weighing each to determine whether the proposed forum is clearly more convenient. [3] But despite patent litigation's many distinctly unique aspects, this multi-factor balancing test is not unique to patent law. *784 Rather, it finds its root in Supreme Court forum non conveniens jurisprudence as adopted by the Fifth Circuit. [4] The Federal Circuit subsequently applies that analysis to Texas patent cases in accordance with its supervision of district courts presiding over patent cases. [5]

While the *Volkswagen II* analysis generally applies smoothly to traditional civil litigation, no patent case is traditional. The Federal Circuit applies a purely procedural test carved out of an otherwise-straightforward wrongful death case to some of the most complex technical and legal issues confronting district courts today. Consequently, the Federal Circuit's transfer law is difficult to decipher at best.

Congress created the Federal Circuit to provide subject-matter expertise in patent cases, and the Federal Circuit does when a dispute centers on substantive patent law or an invention's technical intricacies. [6] But when the parties' dispute turns on aspects of civil procedure not unique to patent law, the court's subject-matter expertise vanishes--and so does a consistent application of regional circuit law. When this trend first emerged in the early 2010s against the backdrop of the Federal Circuit's sparing use of the extraordinary writ, few predicted the avalanche of patent litigation that would hit the Western District of Texas. But in the years since the Federal Circuit first began to take advantage of its mandamus authority to supervise district court rulings on procedural issues, the court has become increasingly enamored with its power.

Accordingly, this article will address the disordered state of patent venue transfer analysis as governed by Fifth and Federal Circuit law, a matter in which policymakers are taking increased interest. [7] Part I surveys venue transfer in the Fifth Circuit and its application by the Federal Circuit to Texas patent cases. Part II critiques the current relationship between the Federal Circuit and district courts, proposing a solution to retain the court's subject-matter expertise on patent-specific issues while ensuring uniform application of regional circuit law. Lastly, Part III proposes updates to venue transfer analysis under the *Volkswagen II*

framework to account for the differences *785 between patent cases and traditional civil litigation and bring transfer analysis up to speed with modern litigation practices.

## I. THE STATUS QUO

Before Waco became the patent-litigation hotbed that it is, the Eastern District of Texas, Marshall Division was booming. [8] Much like Waco now, patentees flocked to Judge Gilstrap's courthouse to file patent-infringement claims, thanks largely to the Federal Circuit's then-broad conception of patent venue. [9] But when the Fifth Circuit decided *Volkswagen II* in 2008, holding that mandamus is an appropriate vehicle to challenge a district court's denial of a motion to transfer, the Federal Circuit saw an opportunity. [10] Only a few months later, the Federal Circuit issued its first-ever writ of mandamus on venue transfer, directing the Eastern District of Texas to grant a motion to transfer it had previously denied and changing tack on over two decades of judicial restraint. [11] Now, the Waco Division is the object of the Federal Circuit's displeasure in the same way that Marshall was in the early 2010s. But to fully understand the nuance--and problems--of the Federal Circuit's review of patent venue transfer decisions, a brief general overview of venue law is helpful.

### A. Venue Transfer in the Fifth Circuit

On May 21, 2005, a Chrysler 300 sedan rear-ended a Volkswagen Golf, propelling the Golf into the side of a flatbed truck. [12] One of the passengers in the Volkswagen, a child named Mariana Singleton, died of her injuries on the way to the hospital. [13] Arguing that design defects in the Volkswagen's rear seat caused Mariana's death and the other passenger's serious injuries, Mariana's family sued Volkswagen in federal court in Marshall, Texas. [14] But the Singletons were North Dallas residents, the driver of the Chrysler 300 *786 that struck them was a Dallas resident, and the witnesses of the accident were all Dallas residents. [15] Moreover, the Singletons purchased the Volkswagen Golf in Dallas, and the accident took place on a Dallas freeway. [16] In short, none of the facts of the case pointed to Marshall.

Even so, when Volkswagen moved to transfer the case to Dallas, the Marshall court refused. [17] Volkswagen subsequently petitioned the Fifth Circuit for mandamus, which the Fifth Circuit granted en banc. [18] In doing so, the Fifth Circuit clarified two points of law. First, to win a motion to transfer, a defendant must show its proposed destination venue is "clearly more convenient" than the plaintiff's chosen forum. [19] In deciding whether the proposed forum is clearly more convenient, courts weigh the eight private- and public-interest factors first enunciated by the Supreme Court in *Gulf Oil v. Gilbert*, a forum non conveniens case. [20]

Second, and most impactful, the court found mandamus an appropriate means of challenging a district court's Section 1404(a) ruling when that ruling amounts to a "clear abuse of discretion" which produces a "patently erroneous result." [21] But the Fifth Circuit also strongly expressed its respect for trial-court deference on venue transfer issues, vowing that "in no case will we replace a district court's exercise of discretion with our own." [22] District courts properly wield significant discretion in many pretrial issues, and transfer is no different.

Accordingly, a defendant seeking mandamus to overturn a Section 1404(a) ruling in the Fifth Circuit must meet a demanding standard in line with the writ's status as an extraordinary remedy. [23] Upon showing that the *787 district court's ruling produced a patently erroneous result, a defendant must still show that he has no other adequate means of relief. [24] Practically, it will be impossible for a party to prove he would have won his case had it been tried in a more convenient venue. This element is thus almost always satisfied. [25] But even if it answers the first two questions in the affirmative, the issuing court must still be satisfied that mandamus is "appropriate under the circumstances." [26] Only when a defendant clears these three hurdles is he entitled to mandamus to correct a district court's denial of transfer. [27]

### B. Mandamus in the Federal Circuit

Twenty-five years after Congress created the Federal Circuit, the court for the first time applied regional-circuit transfer law to grant a petition for mandamus and order a district court to transfer a case. [28] In *TS Tech*, the Federal Circuit found that the Eastern District of Texas's analysis contained "several key errors." [29] First, the Federal Circuit held, the Eastern District gave too much weight to the plaintiff's choice of venue. [30] While *Volkswagen II* forbids courts from treating a plaintiff's choice of forum as a distinct factor weighing against transfer, the Eastern District did exactly that. [31] Second, the Federal Circuit took the district court to task for ignoring the 100-mile rule. [32] The court further took issue with the Eastern District's analysis on the sources of proof and local interests factors. [33] These errors, the Federal Circuit held, rose to the level of a clear abuse of discretion that produced a patently erroneous result. [34] Thus, the Federal Circuit overturned the Eastern District's denial of transfer and established that regional-circuit civil procedure governs before the Federal Circuit.

**\*788** *TS Tech* marked a strong departure from the Federal Circuit's historically sparing use of the extraordinary writ. And in the years since *TS Tech*, the Federal Circuit's fondness for granting petitions for mandamus to overturn district courts' denials of motions to transfer has only grown. But the Federal Circuit's affection for mandamus--at least in supervising district court rulings on transfer--is misguided. Before examining precisely why the Federal Circuit's affinity for mandamus is problematic, a brief look at the origins of Federal Circuit mandamus is instructive.

In its first opinion as a court, the Federal Circuit adopted as binding law the precedents of the Court of Customs and Patent Appeals (CCPA), the court which the Federal Circuit was created to replace. [35] While promoting doctrinal stability in this manner made good sense, adopting CCPA jurisprudence meant that the Federal Circuit inadvertently adopted the CCPA's narrow mandamus standard. That standard, which worked for a court whose jurisdiction was limited to reviewing agency proceedings, proved cumbersome for the broader subject-matter jurisdiction of the Federal Circuit. [36] Over the next several years, the Federal Circuit struggled to clearly define its mandamus authority. And by the time *In re Innotron Diagnostics* came before the court, the Federal Circuit's mandamus precedent was badly confused. [37]

In *Innotron*, Innotron Diagnostics first filed an antitrust lawsuit against Abbott Laboratories in the Central District of California. [38] Abbott then sued Innotron in the same court for infringing its patent related to a method for testing for substances in a patient's blood. [39] After the district court consolidated the cases, the court granted Abbott's opposed motion to sever the antitrust issues and try the patent issues separately. [40] Innotron then filed for mandamus relief before the Federal Circuit. [41]

Denying Innotron's petition for mandamus, the Federal Circuit deeply examined its mandamus authority and began to chart a path forward from its early mandamus precedent. The court first satisfied itself of the validity of its appellate jurisdiction: Because the Central District of California's **\*789** jurisdiction was rooted in 28 U.S.C. § 1338(a), the Federal Circuit had exclusive appellate jurisdiction of all issues in the case despite the antitrust claim's status as the first-filed case. [42] The court then went on to consider the limits of its supervisory authority.

The court first rejected both "extremes" presented by the parties: that the Federal Circuit has no authority to grant petitions for mandamus on procedural issues and that the Federal Circuit has the same supervisory mandamus authority as the regional circuits. [43] The Federal Circuit then noted the Supreme Court's approval of mandamus to exercise "supervisory authority" over district courts "in proper circumstances." [44] The court further noted, however, the distinction between its appellate authority and the regional circuits': While regional circuit appellate review is based on geography, the Federal Circuit's is based on the nature of a district court's jurisdiction. [45]

But under the All Writs Act--also the root of regional-circuit appellate authority--the Federal Circuit may issue "all writs necessary or appropriate in aid of [its] ... jurisdiction[]." [46] Noting this, the Federal Circuit emphasized its authority to issue mandamus to overturn a district court order that would prevent an appeal from a final judgment or otherwise frustrate the proper exercise of its jurisdiction. [47] But "[m]ore troublesome" was the prospect of exercising supervisory authority over district court orders that did not necessarily frustrate the court's jurisdiction. [48] The Federal Circuit categorized such petitions in three ways:

> (1) those implicating responsibilities of regional circuit courts for supervising, administering, overseeing, and managing the courts within the circuit (e.g., assignment of judges, adjustment of calendars, *transfer of case to*

*another district*, reference to master); (2) those that arise in all types of cases, but do not directly implicate the patent or Little ***790** Tucker Act doctrinal jurisprudence of this court (e.g., disqualification of counsel); and (3) those that do directly implicate, or are intimately bound up with and controlled by, the patent and Tucker Act doctrinal jurisprudential responsibilities of this court (e.g., separate trial of patent issues; refusal to apply 35 U.S.C. § 282; court-ordered tests for utility).[49]

The court went on to "disavow[]" supervisory authority over district courts and noted that mandamus would not aid its jurisdiction for petitions which fall in the first two categories.[50] And while the court briefly discussed circumstances that would allow it to exercise mandamus review over petitions which fall into the second category, the court expressly declined to "impos[e] on a district court ... guidance that might differ from the guidance provided by that court's regional circuit in relation to the same procedural rulings in other types of cases."[51] On the whole, the Federal Circuit's holding in *Innotron* evinces a strong reluctance to make use of its mandamus authority that is almost entirely lacking from today's court.

*Innotron* has never been overruled. Nonetheless, the Federal Circuit has steadily moved away from its holding there.[52] And as the court has demonstrated since Judge Albright took the bench in 2018--and even earlier, when the Federal Circuit's focus was primarily on the Eastern District of Texas--*Innotron*'s sensible limitations on Federal Circuit mandamus authority have been practically nullified.[53] Now, litigants are unfortunately left with no clear standard for Federal Circuit mandamus authority.

## II. A CRITIQUE OF THE FEDERAL CIRCUIT'S ROLE IN VENUE TRANSFER

The Federal Circuit was created to provide subject-matter expertise in patent law and other niche, technical aspects of federal law.[54] But when the Federal Circuit applies regional-circuit law, that expertise vanishes--the expert on Fifth Circuit transfer law is, naturally, the Fifth Circuit itself. That ***791** is problematic, to say the least, when seventy-five percent of the Federal Circuit's Section 1404 caseload comes from Texas district courts.[55]

Even so, the current structure of Federal Circuit appellate jurisdiction could be justified if the court applied regional-circuit law consistently and respected the proper division of authority between itself and district courts. It does not.[56] And while a minority of the Federal Circuit has attempted to point out the court's misguided conception of its relationship with district courts,[57] the court remains dedicated to its current course.[58] Thus, it is time for Congress to rein the Federal Circuit in and divest the court of jurisdiction over procedural issues not unique to patent law. Doing so would not only lighten the Federal Circuit's already significant caseload but also ensure proper deference to trial-court determinations in areas of discretion while respecting parties' rights to interlocutory review.

### *A. The Federal Circuit Refuses to Treat Mandamus as the Extraordinary Remedy That It Is*

Petitioners seeking mandamus must meet a "demanding" standard to establish their right to a writ.[59] But the Federal Circuit routinely grants mandamus in situations where the district court's reasoning, if erroneous at all, does not rise to the clear-abuse-of-discretion, patently-erroneous-result standard.[60] District courts are best positioned to make the kinds of fact-intensive determinations that motions to transfer involve.[61] And that ***792** discretion is inherent in the high standard to overturn a district court's transfer ruling--a standard that the Federal Circuit pays lip service to,[62] but in recent years, seems loathe to apply.[63]

For example, Google petitioned the Federal Circuit for mandamus to overturn the Eastern District's denial of its motion to transfer a case filed against it by Eolas Technologies, Inc.[64] The Eastern District of Texas found the other practical problems factor to weigh against transfer, the sources of proof factor to weigh in favor of transfer, and the remaining six factors neutral.[65] Taking issue with the Eastern District's weighing of the transfer factors, the Federal Circuit found that the district court committed "clear error."[66] But the court did not find--nor did Google allege--that the Eastern District "fail[ed] to meaningfully consider the merits of the transfer motion."[67] In fact, no member of the court found that the Eastern District neglected to

consider some piece of evidence or omitted a factor from its analysis. [68] Rather, the majority's quarrel was with how the district court chose to weigh the evidence. [69] "Such reweighing, however, is not the task before the court on mandamus review." [70]

The Federal Circuit's approach to mandamus under *TS Tech* and its progeny has dramatically changed the relationship between district courts and their litigants. In the Western District of Texas, defendants instantly appeal the denial of a motion to transfer to the Federal Circuit, no matter the strength of the trial court's reasoning. [71] In the three years before *TS Tech*, the **\*793** Federal Circuit saw an average of twenty-nine petitions for mandamus each year. [72] But in the years since the court reached its decision in *TS Tech*, the annual average has increased to 46.4 petitions, a 62.5% increase. [73] This implicit lowering of the mandamus standard-- directed almost entirely at one or two judges--significantly undermines trial court authority, as "decisions are subject to immediate second-guessing on appeal." [74]

*B. The Federal Circuit Fails to Consistently Apply Regional Circuit Law*

Not only does the Federal Circuit ignore both its own and the Fifth Circuit's high standard for granting mandamus, but the Federal Circuit also fails to consistently apply transfer law to the facts of different cases. For example, the court vacillates on its analysis of long-distance flights under the willing-witnesses factor. In 2009, the Federal Circuit decided *In re Genentech, Inc.*, reversing the Eastern District of Texas's denial of Genentech's motion to transfer to the Northern District of California. [75] Genentech took issue with the court's application of the Fifth Circuit's 100-mile rule, under which the factor of inconvenience to witnesses increases with every additional 100 miles a witness is required to travel. [76] The Eastern District found the willing-witness factor to weigh against transfer, in part **\*794** because witnesses travelling from Europe would have to travel farther to reach trial in the Northern District of California than in Marshall, Texas. [77] Citing several New York and New Jersey district court cases, the Federal Circuit declared "[t]he significant weight given to the inconvenience of the European witnesses is in direct conflict with the more appropriate approach of several other district court decisions." [78] The court further reasoned that the plaintiff, a German corporation, would "be traveling a great distance no matter [in] which venue the case is tried." [79] The court did not rely on even one Fifth Circuit case in its curious analysis of this point of Fifth Circuit law.

Seven months later, the Federal Circuit considered *In re Nintendo Co.*. [80] There, Nintendo filed a petition for mandamus to overturn the Eastern District of Texas's denial of its motion to transfer to the Western District of Washington. [81] In part because witnesses based in Japan would need to travel 1,756 miles farther to reach Texas than to reach Washington, the Federal Circuit castigated the Eastern District for finding that the willing-witnesses factor weighed only slightly in favor of transfer. [82] But the Federal Circuit did not find that the factor weighed against transfer altogether-- merely that the Eastern District failed to weigh it favorably enough. [83] Despite the Fifth Circuit's commitment only one year earlier not to replace district court discretion with a mere exercise of its own, [84] the Federal Circuit found that it did "not agree" with the Eastern District's analysis, and ordered transfer. [85]

Additionally, the Federal Circuit inconsistently weighs the existence of co-pending litigation under the court congestion factor. In 2014, the court decided *In re Altair Engineering*, declining to grant Altair's petition for mandamus against the Eastern District of Texas's refusal to transfer its patent-infringement case to Michigan, Altair's home forum. [86] Respondent Uniloc had filed three lawsuits in the Eastern District of Texas asserting the same patents against multiple defendants. [87] The district court found that co- **\*795** pending litigation weighed against transfer. [88] Even though the other two Uniloc cases had been dismissed by the time the Federal Circuit heard Altair's petition, the court refused to find fault with the Eastern District's analysis. [89] In an unusually deferential framing of the court's standard of review, the Federal Circuit found "plausible support in the record for the district court's conclusions" and denied mandamus. [90]

But in 2020, Dropbox asked the Federal Circuit to review the Western District of Texas's holding that court congestion weighed against transfer due to co-pending litigation in that district. [91] Respondent SynKloud Technologies filed two patent-infringement lawsuits in the Western District of Texas--one against Dropbox and one against Adobe--both involving the same patents. [92] Denying Dropbox's motion to transfer, the Western District heavily weighed that co-pending litigation. [93] The Federal Circuit

thought differently. Despite denying Dropbox's petition for mandamus, the court severely undermined the Western District's reasoning underpinning its denial of transfer. [94] And the court ultimately left open the possibility for further mandamus proceedings if the Western District failed to reconsider its order. [95]

*C. Since the Federal Circuit is Unwilling to Rein Itself In, Congress Must Check the Court's Power*

This survey of Federal Circuit Section 1404 mandamus paints a picture of a court that has lost sight of the proper role in its relationship with lower courts. [96] Indeed, the former chief judge of the Federal Circuit has expressed ***796** "concern[] that patent litigation is becoming too centralized in a few districts." [97] The merits of the centralization of patent litigation can be considered in future literature, but any such concern is not the Federal Circuit's to address. Curiously, scholars and judges do not engage in the same handwringing over the concentration of corporate litigation in Delaware.

With calls for moderation by some of the court's own judges unheeded, [98] it is time for the body that first created the Federal Circuit to step in and check the court's power. To this end, Congress should divest the Federal Circuit of jurisdiction over procedural issues not unique to patent law. Such a sea change is necessary to restore balance to the relationship between district courts and the Federal Circuit.

To clarify this new arrangement for litigants, a clear rule is necessary to accurately predict which court will hear a given appeal. Accordingly, if regional-circuit law answers the core question on appeal, that appeal is properly heard by the regional circuit--not the Federal Circuit. Such a rule makes good sense. It routes questions of law to the court of appeals whose law governs, lightens the Federal Circuit's considerable Section 1404 caseload, and preserves parties' rights to interlocutory review. A similar framing of this standard was articulated by the Federal Circuit itself twenty-six years ago in *Innotron*: "[T]he 'proper circumstances' warranting entertainment by this court of petitions for writs to a district court in a patent case are those, and only those, in which the patent jurisprudence of this court plays a significant role." [99]

But the court's framing of its mandamus standard in *Innotron*, if adopted whole cloth, would create significant complexity. If the Federal Circuit's patent jurisprudence does not play a significant role in a mandamus petition, the court has no mandamus jurisdiction at all. This perplexing result comes ***797** despite the Federal Circuit retaining jurisdiction of an appeal of a final judgment in that same case under 28 U.S.C. § 1295. [100]

To solve this problem and clarify an otherwise-complex jurisdictional question, regional circuits would retain jurisdiction even of a final-judgment appeal if the central question is one of regional circuit law. Thus, the updated standard that would govern the Federal Circuit's mandamus jurisdiction applies with equal force and utility to a final judgment, as rare as a final judgment on a procedural question may be in a patent case. [101] While this solution would still create a multi-track appeal process for patent litigation, it strikes the best balance between consistent application of regional-circuit law, preserving interlocutory appeals, and promoting simplicity in judicial administration.

**III. IF THE EXISTING FRAMEWORK UNDER *VOLKSWAGEN II* AND *TS TECH* IS MAINTAINED, THE ANALYSIS MUST BE UPDATED TO REFLECT MODERN LITIGATION PRACTICE**

The realities of modern litigation practice bear little resemblance to 2008, when the Fifth Circuit reached its decision in *Volkswagen II*. And they bear even less resemblance to litigation in 1947, when Justice Robert Jackson first articulated the *Gilbert* factors that the Fifth Circuit later adopted. Moreover, patent litigation is unique in many ways. Patent cases are governed by a unique subject-matter jurisdiction statute, a unique venue statute, and a unique court of appeals. [102] Patent cases also have unique pretrial procedures. [103] But nonetheless, regional circuit civil procedure--the same civil procedure that governs a garden-variety diversity-of-citizenship case-- ***798** governs before the Federal Circuit. [104] Transfer analysis is in desperate need of an update to reduce gamesmanship and account for the realities of modern litigation. [105]

*A. The Willing-Witnesses Analysis Must Conform to the Reality of Witness Testimony at Trial*

Under this factor, courts analyze the cost of attendance for willing witnesses, since it is generally cheaper for witnesses to show up at trial in a court that is closer to home. [106] The policy goal this factor seeks to achieve makes sense: If it is substantially cheaper for witnesses to show up at trial in a particular forum, the case should likely be transferred there. [107] Thus, when many potential witnesses reside relatively closer to the proposed destination venue than to the plaintiff's chosen forum, courts usually find this factor in favor of transfer. [108] But, as with many aspects of litigation practice, parties routinely engage in significant gamesmanship to shift the analysis in their favor. [109]

 *799  Acknowledging this gamesmanship and the practical limitations of trial, Judge Albright has repeatedly noted that his court "assumes that no more than a few party witnesses--and even fewer third-party witnesses, if any--will testify live at trial." [110] The Federal Circuit has held this reasoning to be "insufficient to weigh this factor against transfer," denigrating these practical considerations to mere "conjecture." [111] But trial time limits are a fact of life for any litigator, which makes the Federal Circuit's categorical rejection of Judge Albright's reasoning all the more puzzling.

To provide some substance to this debate, I analyzed a set of thirty cases drawn from three of the top destination venues for patent cases: the Northern District of California, Western District of Washington, and Central District of California. [112] Using DocketNavigator and PACER, I accessed the defense pretrial witness list in each of those thirty cases. I then classified each witness as either a fact witness (e.g., corporate representatives and other non-technical witnesses), technical non-expert witness (e.g., engineering team members), prior art witness (non-party, non-expert technical witnesses), technical expert witness, damages expert witness, or other (for the handful of witnesses with insufficient information to classify). This presented a set of over 200 total witnesses. [113] Of those 205 total witnesses, only five percent--ten individuals--were prior art witnesses. [114] And only seven percent--fourteen individuals--were technical non-experts of the kind frequently cited at the motion to transfer stage. [115]

 *800  There are some limitations to this methodology, particularly where parties provide scant detail as to the nature of their witnesses' testimony. Nonetheless, this data underscores the merit behind Judge Albright's argument. A twenty-eight-man team of software engineers in the Northern District of California [116] should not be heavily weighed when those witnesses rarely, if ever, testify in court. Further scholarship may examine a larger data set incorporating other venues, but even this preliminary examination shows the *Fintiv* and *Uniloc* reasoning on this factor is no mere conjecture.

*B. The Sources of Proof Factor Must Account for the Nationwide Availability of Electronic Data*

Under this factor, courts look to the location where the parties keep relevant evidence. [117] The Federal Circuit routinely holds that the sources of proof factor favors transfer when the physical location of an accused infringer's electronic data is near the transferee venue. [118] Focusing on the physical location of evidence is logical in something like a car wreck case, where the vehicle itself--an important piece of evidence--is likely difficult and expensive to transport. Little wonder, then, that the Fifth Circuit's holding in *Volkswagen II* arose out of a car accident. [119]

But such analysis makes little sense in modern patent litigation, where vast amounts of electronic data can be produced anywhere in the country by simply mailing a flash drive or sending an email. Indeed, "all (or nearly all) produced documents exist as electronic documents on a party's server." [120]  *801  And "with a click of a mouse or a few keystrokes," those documents are available anywhere in the world with an internet connection. [121] As Judge Gilstrap has noted, rigidly applying this analysis essentially gives accused infringers a built-in factor weighing in favor of transfer to their chosen venue. [122] This absurd result is yet another indication that modern litigation practice has left *Volkswagen II* behind.

**CONCLUSION**

Patent litigation in Texas is booming, and so is the Federal Circuit's review of Texas patent cases. That court, like any other court of appeals, is not without its flaws. But as patent litigation grows in popularity, so does the impact of those flaws. To begin to remedy those flaws, Congress should divest the Federal Circuit of jurisdiction over procedural issues governed by regional circuit law. This will ensure uniform application of regional circuit law while both promoting the Federal Circuit's expert review

of its own subject matter and protecting parties' rights to interlocutory review. Doing so would also return the Federal Circuit to the proper exercise of its appellate jurisdiction and strengthen the practical exercise of district court discretion in factual issues. But that solves only one side of the equation. To bring venue transfer up to speed with modern litigation practices, the Fifth Circuit should update the willing-witness and sources of proof factors. Altogether, these robust changes can clarify the state of patent venue transfer and streamline the litigation process in an already complex area of the law.

## Footnotes

[a1] J.D. Candidate, 2023, Baylor University School of Law; B.A., Economics, 2019, University of California--Riverside. I thank Professor David Henry for his guidance in writing this Comment and preparing me to practice patent litigation upon graduation. His advice is invaluable, and my law school experience is better because of him. I also thank Magistrate Judge Derek Gilliland for his approachability and his contributions to this Comment. His tireless dedication to the next generation of Baylor Lawyers is unmatched. Finally, the efforts of the *Baylor Law Review* staff in publishing this piece also deserve recognition.

[1] *2022 Patent Dispute Report: First Quarter in Review*, UNIFIED PATENTS (Apr. 1, 2022), https://www.unifiedpatents.com/insights/2022-patent-dispute-report-first-quarter-in-review. Over twenty-six percent of all patent cases in the United States are filed in the Western District of Texas, making it the busiest patent docket in the nation. *Id*.

[2] *In re* TS Tech USA Corp., 551 F.3d 1315, 1319 (Fed. Cir. 2008).

[3] *In re* Volkswagen of Am., Inc. (*Volkswagen II*), 545 F.3d 304, 315 (5th Cir. 2008).

[4] *In re TS Tech*, 551 F.3d at 1319.

[5] *Id*.

[6] *See infra* Part II.

[7] *See* JOHN G. ROBERTS, JR., 2021 YEAR-END REPORT ON THE FEDERAL JUDICIARY 3, 5 (2021), https://www.supremecourt.gov/publicinfo/year-end/2021year-endreport.pdf (highlighting "judicial assignment and venue for patent cases" as an "important matter" which "will receive focused attention" from the Judicial Conference in 2022).

[8] Michael C. Smith, *Rocket Docket: Marshall Court Leads Nation in Hearing Patent Cases*, 69 TEX. B.J. 1045, 1046 (2006).

[9] *See* VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1583 (Fed. Cir. 1990), *abrogated by* TC Heartland LLC v. Kraft Foods Grp. Brands LLC, 137 S. Ct. 1514 (2017).

[10] *Volkswagen II*, 545 F.3d 304, 308 (5th Cir. 2008).

[11] *In re* TS Tech USA Corp., 551 F.3d 1315, 1322 (Fed. Cir. 2008).

[12] Singleton v. Volkswagen of Am., Inc., No. 2-06-CV-222, 2006 WL 2634768, at *1 (E.D. Tex. Sept. 12, 2006).

13     *Id.*

14     *Id.*

15     *Id.* at *1-3.

16     *Id.* at *3.

17     *Id.* at *5.

18     *Volkswagen II*, 545 F.3d 304, 307 (5th Cir. 2008).

19     *Id.* at 315.

20     *Id.* The *Gilbert* private-interest factors are as follows: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. The public-interest factors are as follows: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947).

21     *Volkswagen II*, 545 F.3d at 309-10.

22     *Id.* at 312.

23     *Id.* at 311.

24     *Id.*

25     *Id.* at 318-19.

26     *Id.* at 311 (quoting Cheney v. U.S. Dist. Ct., 542 U.S. 367, 381 (2004)).

27     *Id.*

28     *See In re* TS Tech USA Corp., 551 F.3d 1315 (Fed. Cir. 2008).

29     *Id.* at 1320.

30     *Id.*

31     *Id.*

32   *Id*. Under the 100-mile rule, the factor of inconvenience to witnesses considered under the willing-witness factor increases with every additional 100 miles a witness is required to travel. *Volkswagen II*, 545 F.3d at 317.

33   *In re TS Tech*, 551 F.3d at 1320-21.

34   *Id*. at 1321-22.

35   S. Corp. v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc).

36   Paul R. Gugliuzza, *The New Federal Circuit Mandamus*, 45 IND. L. REV. 343, 366 (2012).

37   *Id*.

38   800 F.2d 1077, 1078 (Fed. Cir. 1986).

39   *Id*.

40   *Id*. at 1079.

41   *Id*.

42   *Id*. at 1080.

43   *Id*. at 1081.

44   *Id*. (quoting La Buy v. Howes Leather Co., 352 U.S. 249, 255 (1957)).

45   *Id*. Among hearing appeals from specialized courts and agencies like the International Trade Commission, Patent Trial and Appeals Board, and Court of Federal Claims, the Federal Circuit exercises appellate review over district court cases when the district court has jurisdiction under 28 U.S.C. § 1338(a). 28 U.S.C. § 1295(a).

46   28 U.S.C. § 1651(a).

47   *In re Innotron*, 800 F.2d at 1081-82.

48   *Id*. at 1082.

49   *Id*. (emphasis added).

50   *Id*.

51   *Id*. at 1083.

52  *See, e.g.*, Lights of Am., Inc. v. U.S. Dist. Ct., 130 F.3d 1369, 1370-71 (9th Cir. 1997).

53  *See, e.g.*, *In re* Princo Corp., 478 F.3d 1345, 1352 (Fed. Cir. 2007) ("The discretionary exception articulated in *Innotron*, if it exists at all, is exceptionally narrow.").

54  *See* S. REP. No. 97-275, at 2 (1981) (noting the "special need for nationwide uniformity" in patent law).

55  *See generally* Christine L. Raffaele, Annotation, *Questions as to Convenience and Justice of Transfer Under Forum Non Conveniens Provision of Judicial Code (28 U.S.C.A. § 1404(a))--Appellate Patent Cases*, 32 A.L.R. Fed. 3d Art. 3 (2018).

56  Peter Lee, *The Supreme Assimilation of Patent Law*, 114 MICH. L. REV. 1413, 1455 (2016) ("[T]he Federal Circuit may not only have an institutional bias in favor of patents, but in favor of itself as well.").

57  *E.g.*, *In re* Apple Inc., 979 F.3d 1332, 1347 (Fed. Cir. 2020) (Moore, J., dissenting) ("Our mandamus jurisdiction is not an invitation to exercise de novo dominion ... over the district court's individual fact findings and the balancing determination that Congress has committed 'to the sound discretion of the trial court.'" (quoting *In re* Vistaprint Ltd., 628 F.3d 1342, 1346 (Fed. Cir. 2010))).

58  Lee, *supra* note 56, at 1455 ("The Federal Circuit produces doctrine that not only deviates from legal norms but also tends to enhance its own power ....").

59  *Volkswagen II*, 545 F.3d 304, 311 (5th Cir. 2008).

60  *See, e.g.*, *In re Apple*, 979 F.3d at 1347-48 (Moore, J., dissenting).

61  *In re Vistaprint Ltd.*, 628 F.3d at 1346. Judge Schall noted, "Our reluctance to interfere is not merely a formality, but rather a longstanding recognition that a trial judge has a superior opportunity to familiarize himself or herself with the nature of the case and the probable testimony at trial, and ultimately is better able to dispose of these motions." *Id*. Such reasoning is altogether absent from today's Federal Circuit.

62  *In re* Barnes & Noble, Inc., 743 F.3d 1381, 1383 (Fed. Cir. 2014). There, Judge Reyna underscored the "exacting" standard petitioners face to overturn transfer, noting that mandamus is reserved only for situations where "the district court's decision amounted to a failure to meaningfully consider the merits of the transfer motion." *Id*.

63  *In re* Google, Inc., No. 2017-107, 2017 WL 977038, at *3-5 (Fed. Cir. Feb. 23, 2017) (Linn, J., dissenting).

64  *Id*. at *1.

65  *Id*. at *2-3.

66  *Id*. at *2.

67  *In re Barnes & Noble*, 743 F.3d at 1383.

68    *In re Google*, 2017 WL 977038, at *4 (Linn, J., dissenting).

69    *Id.* at *5.

70    *Id.*

71    *See* Jonas Anderson et al., *Extraordinary Writ or Ordinary Remedy? Mandamus at the Federal Circuit - Part 3*, PATENTLY-O (Oct. 21, 2021), https://patentlyo.com/patent/2021/10/extraordinary-ordinary-mandamus-federal-circuit.html (noting that the Federal Circuit grants a whopping fifty-two percent of mandamus petitions on venue originating from the Western District of Texas). Based on grant rate alone, the Federal Circuit's venue mandamus policy is troubling. Taking into account the numerous substantive problems with the court's mandamus decisions discussed *infra* Section II.B, the necessity of change becomes painfully clear.

72    Gugliuzza, *supra* note 36, at 396 (analyzing data from statistics maintained by the Federal Circuit and the Administrative Office of the United States Courts).

73    *See* U.S. CT. OF APPEALS FOR THE FED. CIR., REPORTS & STATISTICS: APPEALS FILED, TERMINATED, AND PENDING (2008-2012), https://cafc.uscourts.gov/home/the-court/reports-statistics.

74    Gugliuzza, *supra* note 36, at 395-96. Seeking en banc rehearing of a now-famous (or perhaps infamous, depending on one's viewpoint) Federal Circuit decision granting mandamus, respondent Uniloc 2017 LLC argued that the Federal Circuit "sees as many convenience petitions in one year as it used to see in ten" and noted that the Federal Circuit's practice "is out of step with other ... circuits." Uniloc 2017 LLC's Petition for Rehearing En Banc at 2, *In re* Apple, Inc., 979 F.3d 1332 (Fed Cir. 2020) (No. 2020-135). Since 2008, that brief explained, the Federal Circuit "has issued over seventy mandamus decisions; the Fifth Circuit by comparison has issued seven." *Id.* (emphasis omitted).

75    566 F.3d 1338, 1348 (Fed. Cir. 2009).

76    *Id.* at 1344.

77    *Id.*

78    *Id.*

79    *Id.* at 1345.

80    589 F.3d 1194 (Fed. Cir. 2009).

81    *Id.* at 1197.

82    *Id.* at 1199.

83    *Id.*

84   *Volkswagen II*, 545 F.3d 304, 312 (5th Cir. 2008).

85   *In re Nintendo*, 589 F.3d at 1199.

86   562 F. App'x 978, 980 (Fed. Cir. 2014).

87   *Id*. at 979.

88   *Id*.

89   *Id*.

90   *Id*.

91   *In re* Dropbox, Inc., 814 F. App'x 598, 599 (Fed. Cir. 2020).

92   SynKloud Techs., LLC v. Dropbox, Inc., No. 6:19-CV-00525-ADA, 2020 WL 2494574, at *1, *5 (W.D. Tex. May 14, 2020).

93   *Id*. at *5, *7.

94   *See In re Dropbox*, 814 F. App'x at 599 ("[T]his court recently granted mandamus to direct transfer of the very case the district court cited as weighing against transfer.").

95   *See id*.

96   *See* J. Jonas Anderson et al., *Extraordinary Writ or Ordinary Remedy? Mandamus at the Federal Circuit*, 100 WASH. U. L. REV. 327 (2022). Anderson notes that the Federal Circuit's use of mandamus "to, essentially, 'supervise' district court decisions on a discretionary issue like transfer of venue 'is unprecedented in any federal court of appeals' and 'conforms to no theory of appellate mandamus currently recognized by the ... courts.'" *Id*. at 331 (quoting Gugliuzza, *supra* note 36, at 347).

97   Interview by Laura Robinson & Erin Gibson with Randall R. Rader, Chief Justice, U.S. Ct. of Appeals for the Fed. Cir. (Dec. 9, 2010) [hereinafter Rader Interview]; *see also* Randall R. Rader, Chief Justice, U.S. Ct. of Appeals for the Fed. Cir., The State of Patent Litigation, Speech at the Fifteenth Annual Eastern District of Texas Bench and Bar Conference (Sept. 27, 2011), *in* 21 FED. CIR. BAR J. 331, 341 (2012) ("[T]he best way for us to strengthen our judicial system is to share and promote other venues.").

98   *E.g., In re* Apple Inc., 979 F.3d 1332, 1347 (Fed. Cir. 2020) (Moore, J., dissenting); *In re* Google, Inc., No. 2017-107, 2017 WL 977038, at *3-5 (Fed. Cir. Feb. 23, 2017) (Linn, J., dissenting).

99   *In re* Innotron Diagnostics, 800 F.2d 1077, 1083-84 (Fed. Cir. 1986).

100  *See* Gugliuzza, *supra* note 36, at 404.

101     *See Volkswagen II*, 545 F.3d 304, 318-19 (5th Cir. 2008) (noting the difficulty in proving posttrial that the outcome would have differed in a more convenient forum after denial of a motion to transfer).

102     *See generally* 28 U.S.C. § 1338 (describing the exclusive subject-matter jurisdiction of federal courts for all actions relating to patents); 28 U.S.C. § 1400(b) (describing the special venue provision for patent infringement actions); 28 U.S.C. § 1295(a)(1) (describing the jurisdiction of the United States Court of Appeals for the Federal Circuit).

103     *See generally* Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) (establishing the precedent for *Markman* hearings, wherein the court construes a patent's claims); J. Jonas Anderson & Peter S. Menell, *Informal Deference: A Historical, Empirical, and Normative Analysis of Patent Claim Construction*, 108 NW. U.L. REV. 1, 25 (2013) ("Within a short time, the concept of the 'Markman hearing' became established and widely used as a pretrial proceeding to construe patent claims.").

104     *In re* TS Tech USA Corp., 551 F.3d 1315, 1319 (Fed. Cir. 2008).

105     *See* Mark A. Lemley, *The Surprising Resilience of the Patent System*, 95 TEX L. REV. 1, 56 (2016) (arguing that making patent litigation "quicker and cheaper" is the better avenue for reform, since recent substantive changes to patent law have had little effect on patent acquisition or enforcement).

106     *See Volkswagen II*, 545 F.3d at 317 ("[A]dditional distance [from home] means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment." (quoting *In re* Volkswagen AG, 371 F.3d 201, 205 (5th Cir. 2004))).

107     *See In re* Google LLC, No. 2021-170, 2021 WL 4427899, at *4 (Fed. Cir. Sept. 27, 2021) ("[T]he inquiry should focus on the cost and inconvenience imposed on the witnesses by requiring them to travel to a distant forum and to be away from their homes and work for an extended period of time.").

108     *E.g.*, *In re* Genentech, Inc., 566 F.3d 1338, 1345 (Fed. Cir. 2009) ("Because a substantial number of material witnesses reside within the transferee venue ... and no witnesses reside within the [transferor venue], the district court clearly erred in not determining this factor to weigh substantially in favor of transfer."); VoIP-Pal.com, Inc. v. Google LLC, No. 6:21-cv-00667-ADA, 2022 WL 2068254, at *5 (W.D. Tex. June 8, 2022) (six more witnesses in the Northern District of California than the Western District of Texas shifted the willing-witness factor in favor of transfer); VoIP-Pal.com, Inc. v. Amazon.com, Inc., No. 6:21-cv-00668-ADA, 2022 WL 2110697, at *6 (W.D. Tex. June 10, 2022) (counting witnesses in each forum).

109     *E.g.*, Scramoge Tech. Ltd. v. Apple Inc., No. 6:21-cv-00579-ADA, 2022 WL 1667561, at *2 (W.D. Tex. May 25, 2022) (noting that "[Apple venue declarant Mark] Rollins frequently and repeatedly submitted unreliable and misleading declarations to this Court" and collecting cases showing the same); Motion Offense, LLC v. Google LLC, No. 6:21-CV-00514-ADA, 2022 WL 5027730, at *2 (W.D. Tex. Oct. 4, 2022) ("Vague, attorney-driven venue declarations frequently accompany transfer motions filed in this Court.").

110     Fintiv, Inc. v. Apple Inc., No. 6:18-CV-00372-ADA, 2019 WL 4743678, at *6 (W.D. Tex. Sept. 13, 2019); *see also* Uniloc 2017 LLC v. Apple Inc., No. 6-19-CV-00532-ADA, 2020 WL 3415880, at *13 (W.D. Tex. June 22, 2020) ("[A]t most only one or two third-party witnesses will testify live, and each side is likely to only call a few witnesses due to trial-time constraints.") (emphasis omitted).

111     *In re* Atlassian Corp. PLC, No. 2021-177, 2021 WL 5292268, at *3 (Fed. Cir. Nov. 15, 2021); *accord In re* Hulu, LLC, No. 2021-142, 2021 WL 3278194, at *3 (Fed. Cir. Aug. 2, 2021) ("This categorical rejection of Hulu's witnesses is entirely untethered to the facts of this case and therefore was an abuse of discretion.").

112     Anderson et al., *supra* note 96, at 41.

113     Matthew Vitale, Analysis of Witness Lists (Aug. 1, 2022) (on file with *Baylor Law Review*).

114     *Id*.

115     *See, e.g.*, VoIP-Pal.com, Inc. v. Amazon, No. 6:21-cv-00668-ADA, 2022 WL 2110697, at *6 (W.D. Tex. June 10, 2022) (Amazon arguing its twenty-eight-man software-engineering team--i.e., technical non-expert witnesses--in the Northern District of California weighed in favor of transfer there).

116     *Id*.

117     *E.g., In re* Apple, Inc., 979 F.3d 1332, 1340 (Fed. Cir. 2020); *In re* Genentech, Inc., 566 F.3d 1338, 1345 (Fed. Cir. 2009).

118     *In re Genentech*, 566 F.3d at 1345. The Federal Circuit presumes that the "bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *Id*. But this analysis is the exact inverse of the Fifth Circuit's on the same question: "[T]he movant has the burden to establish good cause, which requires an actual showing of the existence of relevant sources of proof, not merely an expression that some sources likely exist in the prospective forum." Def. Distributed v. Bruck, 30 F.4th 414, 434 (5th Cir. 2022); *see also* Motion Offense, LLC v. Google LLC, No. 6:21-CV-00514-ADA, 2022 WL 5027730, at *6 (W.D. Tex. Oct. 4, 2022) ("When applying only the Fifth Circuit cases as urged by Motion Offense, [the sources of proof] factor weighs against transfer due to the imposition of the burden on the movant. ... However, the Federal Circuit has made clear that under this very same fact pattern, this factor weighs in favor of transfer.").

119     *Volkswagen II*, 545 F.3d 304, 304 (5th Cir. 2008).

120     Fintiv, Inc. v. Apple Inc., No. 6:18-cv-00372-ADA, 2019 WL 4743678, at *4 (W.D. Tex. Sept. 13, 2019).

121     *Id.*; *see also* Koss Corp. v. Apple Inc., No. 6-20-CV-00665-ADA, 2021 WL 5316453, at *4 (W.D. Tex. Apr. 22, 2021) (noting that "the Fifth Circuit inserts a rigid test into an otherwise flexible analysis").

122     Uniloc USA Inc. v. Samsung Elecs. Am., Inc., No. 2:16-cv-638-JRG, 2017 WL 11631407, at *4 (E.D. Tex. Apr. 19, 2017); *see also Koss*, 2021 WL 5316453, at *4 ("In close cases, the relative ease of access to sources of proof may serve as the deciding factor in a Court's analysis .... This thumbs the scales in the movant's favor as to a motion that purportedly defers to the plaintiff's choice of venue when the two venues are comparably convenient.").

74 BLRLR 783

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.